IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

FILED
JUN 13 2013
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS OFFICE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) Criminal No. 13-CR-30094-MJR |
| HARRISON POMERANTZ, | ) |
| | ) |
| Defendant. | ) |

## STIPULATION OF FACTS

The United States of America and defendant stipulate as follows:

1. Creative Vacation Solutions was a Florida Corporation based in Palm Beach County, Florida and formed in 2008. CVS had several sales offices located in central Florida including offices at West Palm Beach, Belvedere, Boca Raton, Okeechobee, Green Acres and Lake Worth. Some of these offices resembled franchise operations in that they were owned and operated by others, but used the same business name, the same sales pitches and collected money through common credit card merchant accounts. CVS was the successor of Universal Marketing Solutions (UMS). Sales at UMS and CVS were conducted in the same manner.

2. HARRISON POMERANTZ worked at UMS and CVS, primarily in the "Main Office," as both an opener and a closer.

3. UMS and CVS engaged in a scam intended to deceive consumers into believing that these timeshare resale companies had obtained firm and binding offers from purchasers to buy that consumer's timeshare interest. Telemarketers typically provided a specific closing date sixty to ninety days out and told clients that they would have to pre-pay closing related expenses of up to

1

several thousand dollars. Telemarketers then processed charges against the consumers' credit cards and pocketed the money.

4. The established, proven and highly successful sales pitch that was used by UMS and CVS telemarketers contained material misrepresentations of fact and misleading statements to prospective customers, including the following:

    A. UMS and CVS agents falsely represented that the company had received an offer on the customer's time share.

    B. UMS and CVS agents falsely represented that a closing was scheduled on the property, often on a specific date thirty to ninety days hence.

    C. UMS and CVS agents falsely represented that the fees were for deed and title searches, maintenance profiles, deed preparation, title transfer and for similar expenses.

5. In general, the closing date given to customers was made up by the telemarketer. The policy of UMS and CVS was that the made up closing date needed to be at least 60 to 90 days from the date of the call. The purpose of the delayed closing date was to postpone when customers would call their credit card companies or banks to complain that they had been defrauded, an inevitable result from their supposed "closing" dates having come and gone without the client receiving the sales proceeds check they had been promised. Delaying that inevitable reporting by the client was important to the success of the scheme, since customer complaints would almost certainly result in charge backs against the company's merchant account and thus jeopardize the ability of the company to process bank card transactions and get paid.

6. The representations made in the sales pitch used by UMS and CVS were false and fraudulent in that the offers on the consumer's property were a fantasy, the closing dates were totally make believe, and the purported purpose of the fees a pure invention by the telemarketer.

2

The fees were not being used for closing costs, but were being purloined to enrich the telemarketers and their bosses and pay for the continuing expenses associated with the scam. Only a relatively small amount was going to the cost of listing the property on CVS's website, if indeed the consumer's property was even listed there.

7. Despite collecting millions of dollars from consumers for timeshare resale services, UMS and CVS were not instrumental in selling a single timeshare. While occasionally desperate timeshare owners expressed interest in abandoning their timeshare interest because of recurring annual fees, and one of the principals of UMS and CVS personally would purchase timeshare units at distressed fire sale prices, there were substantially no sales at or anywhere near the full asking price of the seller. UMS and CVS made no substantial effort to either market or advertise any customer's timeshare interest other than a simple listing on a website which was made at relatively nominal expense. UMS and CVS made little effort to promote the website and a listing on the website was of little practical value to its customers.

8. The sales practices of UMS and CVS were false and misleading and was a business permeated with fraud in an industry pervaded by deceit.

9. Defendant utilized sales scripts that in the circumstances in which they were used created an appearance which was false and deceptive and calculated to induce a false belief as to the true facts.

10. In connection with the transactions described in the Indictment, Defendant engaged in a scheme involving deceit and trickery in order to gain an unfair and dishonest advantage over hundreds of victims located in the Southern District of Illinois and elsewhere throughout the United States, and Canada.

11. In furtherance of the scheme, Defendant caused contracts and other documents to

be transmitted by U.S. Mail or by interstate commercial carrier.

12. In furtherance of the scheme, Defendant caused interstate telephone calls to be made to the Southern District of Illinois.

13. In 2009, POMERANTZ received $40,840.66 in 1099-MISC income from CVS and was responsible for approximately 61 sales aggregating $122,521.98 in loss.

_____
HARRISON POMERANTZ
Defendant

_____
GLENN SEIDEN
Attorney for Defendant

Date: 6/13/13

STEPHEN R. WIGGINTON
United States Attorney

_____
KATHERINE L. LEWIS
Assistant United States Attorney

Date: 6/13/13

4